IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| 3 MAN CORPORATION, | : | BANKRUPTCY NO.: 5-12-bk-00879-JJT |
| | : | |
| ALLEGED DEBTOR | : | |

# **OPINION**

On February 16, 2012, an Involuntary Petition in bankruptcy was filed against 3 Man Corporation by Petitioning Creditors, Core-Mark Midcontinent, Inc., Clover Farm Dairy, and Glassmere Fuel Service, Inc. On February 28, 2013, Amguard Insurance Company joined as a petitioner. Doc. #102. On March 22, 2013, the parties stipulated that "Glassmere, which asserted a pre-petition claim against the Alleged Debtor in the sum of $26,971.08 for trade goods, holds a valid claim in such amount against the Alleged Debtor that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount." Doc. #133. On March 29, 2013, Amguard attempted to withdraw as a Petitioning Creditor. Doc. #136. On April 2, 2013, Express Fuel Distributers Corp., a $221,000 creditor, filed a joinder as a Petitioning Creditor. Doc. #143. Express Fuel has been acknowledged by the Debtor as a qualifying creditor. Transcript of May 2, 2013 at 53. Doc. #164.

The relevant portion of § 303 of the Bankruptcy Code applicable here, reads:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title--

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $14,425 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

> (2) if there are fewer than 12 such holders, excluding any
> employee or insider of such person and any transferee of a transfer
> that is voidable under section 544, 545, 547, 548, 549, or 724(a) of
> this title, by one or more of such holders that hold in the aggregate
> at least $14,425 of such claims;

11 U.S.C.A. § 303. Footnotes omitted.

3 Man has conceded that both Glassmere and Express Fuel are claimants not contingent or subject to bona fide dispute and in amounts sufficient to satisfy the monetary minimum mandated by the code. It has been also conceded that there are 12 or more creditors thus making § 303(b) applicable. Transcript of May 2, 2013 at 42. Doc #164. Thus, finding the existence of a third creditor meeting the criteria required was a necessity for the Petitioners to succeed.

On May 2, 2013, after hearing, Amguard's attempt to withdraw as a Petitioning Creditor was denied. Doc. #159. Also on that date, the Involuntary Petition was denied for reasons set forth on that record. Doc. #160. The initial hearing on the Petitioners' request for an adjudication took place over a four day period. It will hereinafter be referred to as the first session. Subsequent to that determination, it came to light that one or more averments to the Court may have been "inaccurate." Doc. #171.[1] For that reason, the Court granted a motion to reconsider the disposition and reopened the record with regard to the status of one of the petitioning creditors, Amguard Insurance Company. Doc. #200. The rehearing on the Petition, hereinafter referred to as the second session, took place over four days, i.e., November 14-15, 2013 and January 16-17, 2014.

The debt at issue arose pursuant to the placement of workmen's compensation insurance by the Debtor through Amguard for the period April 1, 2010 to November 19, 2010. According to policy information gleaned from Petitioners' Exhibit 82, the policy (Policy No.

---

[1] Pending the disposition of the of the Involuntary Petition, the Court has deferred further action on what, at the minimum, may have been a lack of candor to the Court.

THWC115941) was issued about March 31, 2010, for the original term of April 1, 2010 to April 1, 2011. The annual premium was $22,685. The initial down payment was $4,537 received March 31 to be followed by eight equal monthly installments of $2,268.50. P-Ex. 44 (Bates stamp 3Man-0025) and P-Ex. 82[2]. The cited exhibits seem to support a finding that the first six installments were received in a timely manner, with the last payment made about September 1, 2010. The record, thus, would appear to suggest that total payment of $18,148 was received on the original bill leaving a balance due of approximately $4,537. On November 9, 2010, Amguard issued a cancellation notice to 3 Man for nonpayment of premium, effective November 29, 2010. P-Ex. 82. On December 17, 2010, in an email, Amguard employee, Michelle Roberts from Thom Pesta's office,[3] acknowledged the need to cancel the policy "back to 11/19." P-Ex. 82. After the cancellation, 3 Man secured alternative insurance from Atlantic States Insurance Company through Donegal Insurance group. Debtor's Ex. 17. On February 28, 2011, the Pennsylvania Compensation Bureau notified Amguard that two of 3 Man's policies provided duplicate coverage, which was impermissible under their guidelines. P-Ex. 68 and 82. On March 10, 2011, a final audit performed by Compupay Ins. Svcs., Inc. concluded that, based on employees remuneration, the premium should have been $34,855 through November 29, 2010. P-Ex. 82. On March 21, 2011, a revised cancellation notice was sent cancelling the policy, effective November 19, 2010. P-Ex. 82. On March 29, 2011, well after the policy terminated, 3 Man's chief executive officer wrote to Amguard complaining of being overcharged. P- Ex. 43. On April 6, 2011, 3 Man's bookkeeper complained to Amguard of "double coverage for a short period in November." P-Ex. 44. This point has not been disputed by Amguard and was

---

[2] Unless otherwise indicated, all references to Petitioners' exhibits are to those admitted during this matter's second four day session.

[3] Thomas Pesta was the collections coordinator for Amguard Insurance. P-Ex. 77 (Deposition at page 5).

presumably rectified by the revised audit conducted April 7, 2011, adjusting the termination date to November 19, 2001, rather than November 29, 2011. Surprisingly, this audit determined that the premium should have been a larger number of $36,477. The increase appears to be due to the inclusion of a significant "short rate penalty premium." P-Ex. 82. On that date, a final audit billing statement was issued showing a balance due Amguard of $13,460.50. P-Ex. 44.

On May 20, 2011, Amguard sent a demand letter to 3 Man from their legal department. P-Ex. 81.

On April 1, 2013, a $5000 credit was made against a then balance alleged due Amguard of $13,460.50, leaving a remaining obligation of $8,460.50. P-Ex. 77 at 15-16.

The issue comes down to whether Amguard (as the third essential creditor) holds a claim that is not "the subject of a bona fide dispute as to liability or amount."

The record is clear that 3 Man disputes the accuracy of the current balance owing Amguard. The explanation for that dispute is somewhat obscure. Nevertheless, the time line created by the record clarifies the parameters of that dispute.

Based on information supplied to Amguard by 3 Man, Amguard sold a workmen's compensation insurance policy to 3 Man for the period of April 1, 2010 to April 1, 2011. P-Ex. 44 at Bates stamp 56.

When the policy was proposed, it was based on total estimated wages of $881,045. P-Ex. 57 at 47. The calculation was based on (1) code 917 employees (convenience grocery) billed at the rate of 2.77 per $100 on an estimated salary of $863,858, and (2) code 953 employees (clerical) billed at the rate of .35 per $100 on an estimated salary of $17,187. P-Ex. 57 at 47 and P-Ex. 65 at 65. This appears to account for the original policy billing of $22,685. D-Ex. 13 and P-Ex. 82. The Debtor was billed a down payment of $4,537 and eight monthly installments of $2,268.50. P-Ex. 44. 3 Man made payments of $18,330.75 with the last payment being made on

September 1, 2010. The policy was cancelled for nonpayment effective November 29, 2010. P-Ex. 44 at Bates stamp 0058. A final audit performed on March 10, 2011, set the bill at $34,855. The significantly larger premium was based on the actual payroll of $1,450,439. P-Ex. 50 at 29, Deposition of Auditor Joann Calciano. Actual salaries were 64% higher than the estimate used to originate the initial billing. 3 Man knew or should have known that it would have been subjected to a substantial surcharge at the end of the policy period once a standard audit occurred. This would be true despite the fact that the cancellation terminated the policy over four months prior to its billed term.

As used in the Bankruptcy Code, there is no statutory definition of the term "bona fide dispute" leaving such detail to various courts where such determination becomes a pivotal issue. Our Circuit Court of Appeals has discussed the term by suggesting that "'substantial' factual and legal questions raised by debtor preclude [a] finding of involuntary bankruptcy." *B.D.W. Associates, Inc. v. Busy Beaver Bldg. Centers, Inc.* 865 F.2d 65, 67 (3rd Cir.1989), quoting from *In re Busick*, 831 F.2d 745 (7th Cir.1987).

"The burden is initially on the creditor that joins in filing an involuntary bankruptcy petition to establish, by preponderance of the evidence, a prima facie case that its claim is not subject to a bona fide dispute." Bankruptcy Evidence Manual § 301:24 (2013 ed.). Despite the fact that Amguard was an unwilling participant after their attempt to withdraw was denied, I find that Petitioners did make a prima facie showing of an undisputed obligation owing from the putative Debtor. The evidence established that Amguard sold the Debtor a one year workman's compensation policy for a fixed sum payable in installments. The Debtor made installment payments for approximately 6 months without questioning the obligation. The Debtor stopped making payments and the policy was terminated prematurely. Pursuant to standard procedure, the policy was audited by an outside firm which audit reflected a much higher than estimated

actual payroll, and a final billing was presented to the Debtor. During the policy's active status, the billing was never challenged.

Once this prima facie showing is made, the burden shifts to the putative Debtor to establish the existence of a bona fide dispute. *In re Green Hills Development Co., L.L.C.*, 741 F.3d 651, 658 (5th Cir. 2014). 3 Man advances this defense by arguing that there were several errors of calculation that resulted in it being overcharged. I summarize them as follows: (1.) The Debtor was billed through November 29, 2010, when the policy should have terminated November 19, 2010, the effective date of the replacement policy. (2.) The policy was to exclude company officers from payroll upon which number the premium is based. Not all officers were excluded. (3.) Several employees were carried on the policy as "convenience grocery employees" at a much higher billable rate than their actual position which were clerical office employees.

My initial reaction to these arguments is to dismiss them if they were no more than disputes of a *de minimus* nature. This requires to me to analyze the computation of the obligation allegedly owed to Amguard.

Originally, the Debtor was billed approximately $22,000 based on an anticipated payroll of about $800,000. On that basis it had made installment payments. After the policy was terminated for nonpayment of premium, an audit conducted by a third party found that the actual payroll of about $1,400,000 demonstrated that the Debtor was significantly under billed.[4] While the record is such that the proper calculation of the original bill was not articulated, I can estimate that, based on the actual payroll to the date of the audit, the annual premium would have

---

[4] Audits are a normal procedure after the conclusion for policies of this nature so that premiums can reflect the actual risk involved.

been $32,413.[5] Presumably, there would exist some sort of reduction for terminating the policy over four months prior to its scheduled expiration. The only deduction that I found that could be so attributed is set out as $2,322. P-Ex. 44 at Bates stamp 73. While the calculations were never explained on the record, it appears rather odd that a risk reduction of over 1/3 caused by early termination would result in such a minor abatement. This difficulty I have in calculating how the final statement was arrived at suggests to me that the Debtor would have good reason to question the final billing.

The Petitioners have had an enormous amount of time to investigate the calculation of the final billing from Amguard to 3 Man. They have deposed numerous people and have introduced near 100 exhibits regarding this creditor. Testimony has been offered by no less than 10 employees of Amguard or its affiliates. With all this said, I still am unable to reconstruct how the final billing of $13,460.50 was computed.[6]

The Bankruptcy Amendments of 2005 made a slight change to § 303 of the Bankruptcy Code. Specifically, the Amendment added the words to the statute that a petitioning creditor's claim must not be "the subject of a bona fide dispute *as to liability or amount*." *(Emphasis mine)*. Many courts evaluating this Amendment concluded that a dispute as to any amount of liability would disqualify the creditor from pursuing the petition.[7] The more recent cases,

---

[5] P-Ex. 44 at Bates stamp 73. Total cost less short rate penalty premium.

[6] According to Brandon Sipple, corporate counsel for Amguard, the calculation was arrived at by taking the balance as of April 7, 2011 or $15,748.50, adding an installment fee of $14.00 and an NSF charge of $20.00 and reducing that by $2,322.00, which was a credit resulting from the revised final audit of April 7, 2011. There was no explanation as to how the balance of $15,748.50 was calculated. Transcript of April 3, 2013 at 159 and P-Ex. 32 of first session (Exhibit C to the Complaint).

[7] *In re Excavation, Etc., LLC*, No. 09-60953-fra7, 2009 WL 1871682 at *1–2 (Bkrtcy. D.Or. June 24, 2009);
*In re Elverson*, 492 B.R. 831, 842 (Bkrtcy. E.D.Pa. 2013);
*In re Skyworks Ventures, Inc.*, 431 B.R. 573, 578 n.1 (Bkrtcy. D.N.J. 2010);
*In re Rosenberg*, 414 B.R. 826, 846 (Bkrtcy. S.D.Fla. 2009);
*In re Euro–American Lodging Corp.*, 357 B.R. 700, 712 n.8 (Bkrtcy. S.D.N.Y. 2007);

[K:\Cathy\Opinions-Orders filed 2014\5-12-bk-00879-JT_3_Man_Corp.pdf]    7

Case 5:12-bk-00879-JJT    Doc 251    Filed 08/29/14    Entered 08/29/14 13:24:25    Desc
Main Document    Page 7 of 10

however, allow the partial addition of that amount of debt that is not disputed.[8] The import of this trend is that in the latter situation, both the creditor and the undisputed amount is added to the requirements mandated by § 303. This approach indeed makes sense. As one author put it, "[i]t is not clear whether a bona fide dispute exists if any amount of the claim is disputed. Such an interpretation could vitiate the effectiveness of the statute. Taken to an extreme, if $99,900 of a $100,000 debt was undisputed but $100 was disputed, an alleged debtor could seek to disqualify the petitioning creditor." 2 Bankruptcy Litigation § 11:10. This result strikes me as absurd, so I will embrace an interpretation that a dispute as to amount allows me to include in the § 303 requirements that portion of the amount not disputed as well as the creditor that holds it.

This is where I am confronted with somewhat of a dilemma. After reviewing the record as well as the exhibits, I am satisfied that some amount is owed by 3 Man to Amguard. After all, the basis for the policy was woefully underestimated in terms of payroll. Nevertheless, the policy was terminated prematurely and the putative Debtor made considerable payments on the

---

*In re Regional Anesthesia Associates PC*, 360 B.R. 466, 470 (Bkrtcy. W.D.Pa. 2007);
*In re Mountain Dairies, Inc.*, 372 B.R. 623, 634 (Bkrtcy. S.D.N.Y. 2007);
*In re Orlinsky*, No. 06–15417–BKC–RAM, 2007 WL 1240207, at *1 (Bkrtcy. S.D.Fla. Apr. 24, 2007);
*In re Metro Cremo & Sons, Inc.*, No. 1:08-bk-01798MDF, 2008 WL 5158288 at *4 n.8 (Bkrtcy. M.D.Pa. Sept. 29, 2008);
*In re Vicor Technologies, Inc.*, No. 12-39329-EPK, 2013 WL 1397460, slip op. (Bkrtcy. S.D.Fla. April 5, 2013).

[8] *In re DemirCo Holdings, Inc.*, No. 06-70122, 2006 WL 1663237 (Bkrtcy. C.D.Ill. June 9,2006);
*In re Fustolo*, 503 B.R. 206, 218 (Bkrtcy. D.Mass. 2013);
*In re Miller*, 489 B.R. 74, 81–82 (Bkrtcy. E.D.Tenn. 2013) ("the court does not agree that post-BAPCPA § 303(b) requires an all-or-nothing analysis: that the statutory language 'as to liability or amount' should be read as meaning that any dispute as to any portion of the amount of a claim owed disqualifies a creditor from being a petitioning creditor");
*In re Tucker*, No. 5:09-bk-914, 2010 WL 4823917, slip op. at *6 (Bkrtcy. N.D.W.Va. 2010) ("[t]he better reasoned authority suggests that a petitioning creditor is not disqualified even if a bona fide dispute exists regarding a portion of its claim");
*In re Wishgard, LLC*, No. 13-20613-CMB, 2013 WL 1774707, slip op. at *5 (Bkrtcy. W.D.Pa. April 25, 2013) ("this Court finds the analysis in Miller to be the persuasive interpretation");
*In re Roselli*, No. 12-32461, 2013 WL 828304, slip op. at *9 (Bkrtcy. W.D.N.C. March 6, 2013);
*In re Mountain Country Partners, LLC*, No. 12-20094, 2012 WL 2394714, slip op. at *3 (Bkrtcy. S.D.W.V. June 25, 2012);
*In re EM Equipment, LLC*, 504 B.R. 8 (Bkrtcy. D.Conn. Dec. 30, 2013).

original quote. No amount of mathematical calculations, however, allows me to determine how the original policy bill of $22,685 finally became a balance owing of $13,460.50.[9] Amguard's auditor was unable to explain the specific calculation in arriving at a billing except to say, "[a]ll we do, we put the numbers in and we have a system, a computer system, that generates the billing." Transcript of November 15, 2013 at 28. Doc. #229. If I cannot make this calculation after multiple days of testimony and almost 100 exhibits, then I have little choice but to conclude that the dispute between the parties is bona fide, and this creditor cannot be included among those petitioners holding a claim free from such dispute.

Petitioning creditors argue that the courts have created a judicial exception to the requirements that there must be at least three petitioning creditors not in bona fide dispute. On this topic, Collier writes:

> [8] Judicially Created Exception
>
> Although the three-creditor requirement is clear on its face and the Bankruptcy Code contains no statutory exception, some courts have created a judicial exception to the numerosity requirement. This is an expansion of an exception that started in the context of single-creditor cases. However, it has now been employed in other contexts, including where there were only two eligible petitioning creditors and the debtor had more than 11 creditors. The judicial exception rests on the premise that if there has been conduct by the debtor that affected the creditor count, whether through fraud, preferential payments or trickery, application of the three-creditor rule is unwarranted. While seemingly at odds with the Code, and while not achieving universal approval among courts, this approach is consistent with the implicit requirement that both debtors and creditors act in good faith in the context of involuntary cases. (Footnotes omitted)

2 Collier on Bankruptcy ¶ 304.14[8] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)

Petitioning creditors suggest that the alleged inequitable conduct of the Debtor in conveying virtually all of its assets to a related entity and exerting its "off the record" efforts to

---

[9] This balance does not include the 2014 settlement payment of $5,000 paid by 3 Man to Amguard in an attempt to resolve their differences.

secure a withdrawal of Amguard is just the type of conduct that would allow for such a judicial exception. I disagree since neither the transfer of assets or the unsuccessful effort to secure the withdrawal of the third petitioning creditor affected the actual creditor count or the threshold amount for undisputed claims.

For these reasons, the Involuntary Petition must be denied.

My Order will follow.

By the Court,

*John J. Thomas, Bankruptcy Judge*
(CMS)

Date: August 29, 2014